UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Karen Charbonneau,

       Plaintiff,

       v.                               Civil Action No. 2:11-CV-9

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 17, 22)

Plaintiff Karen Charbonneau brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Charbonneau's motion to reverse the Commissioner's decision (Doc. 17), and the Commissioner's motion to affirm the same (Doc. 22). For the reasons stated below, the Court DENIES Charbonneau's motion, and GRANTS the Commissioner's motion.

## Background

Charbonneau was forty-eight years old on her alleged disability onset date of December 13, 2007. She completed school through the eighth grade, and thereafter obtained a graduate equivalency degree (GED) and special job training in office management. She has been employed as a "kitchen worker" in a public school, and as a pharmacy technician for approximately eleven years. (AR 132.)

Charbonneau had a traumatic childhood, stemming from her mother's and other family members' substance abuse, and including being sexually molested by her foster father.  She has been married twice, and has three sons and a daughter.  During the alleged disability period, she resided with her husband and adult daughter.  In 2005, Charbonneau began seeking mental health treatment, and was diagnosed with anxiety and depression.  In December 2007, she was involved in a motor vehicle accident, resulting in lower back pain with severe spasms, which exacerbated her depression.  Treatment for the back pain included but was not limited to attending physical therapy, wearing a TENS[1] unit, receiving epidural injections, and taking narcotics.  In February 2009, Charbonneau elected to have surgery to remove two small cerebral aneurysms which had been causing her anxiety and migraine headaches.  Since then, she has not had treatment for the aneurysms.  In June 2009, Charbonneau fell, worsening her back pain and, in turn, her depression.  In addition to her back pain and depression, Charbonneau has suffered from obstructive sleep apnea, hypertension, migraine headaches, and obesity.

On September 12, 2008, Charbonneau protectively filed an application for disability insurance benefits.  Therein, she alleged that, starting on December 13, 2007, the date of her motor vehicle accident, she has been unable to work due to lower back pain, left hip and leg pain, buttock pain, and depression.  (AR 131.)  She further alleged that she has been unable to stand without pain for more than thirty-to-forty-five minutes

---

[1]  "TENS" is the acronym for Transcutaneous Electrical Nerve Stimulation, which is "a method of reducing pain by passage of an electric current."  STEDMAN'S MEDICAL DICTIONARY 1838 (28th ed. 2006).  "A 'TENS unit' is a pocket size, portable, battery-operated device that sends electrical impulses to certain parts of the body to block pain signals."  *Verhow v. Astrue*, No. 08-CV-6423-CJS, 2009 WL 3671665, at *8 n.5 (W.D.N.Y. Oct. 29, 2009).

at a time, and has been unable to sit and walk without pain for extended periods of time. (*Id.*) Charbonneau's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on May 25, 2010 by Administrative Law Judge ("ALJ") Paul Martin. (AR 543-82.) Charbonneau appeared and testified, with the assistance of a non-attorney representative. A vocational expert ("VE") also testified at the hearing. On September 1, 2010, the ALJ issued a decision finding that Charbonneau was not disabled under the Social Security Act from her alleged onset date of December 13, 2007 through the date of the decision. (AR 8-19.) A few months later, the Decision Review Board ("DRB") affirmed the ALJ's decision, with supplementation. (AR 1-4.) Having exhausted her administrative remedies, Charbonneau filed the Complaint in this action on January 12, 2011. (Doc. 3.)

## **ALJ/DRB Determination**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed

3

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Charbonneau had not engaged in substantial gainful activity since her alleged onset date of December 13, 2007.  (AR 10.)  At step two, the ALJ found that Charbonneau had the following severe impairments: degenerative disc disease of the lumbar spine, status post transient ischemic attack and aneurysm, and depressive disorder with panic.  (AR 11.)  Conversely, the ALJ found that Charbonneau's obstructive sleep apnea was non-severe, given that a March 2008 sleep study indicated the disorder was resolved, and Charbonneau had reported that CPAP therapy enabled her to sleep through the night.  (*Id.*)  At step three, the ALJ found that none of Charbonneau's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 11-12.)

Next, the ALJ determined that Charbonneau had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Charbonneau] requires the ability to alternate between sitting and standing. [She] is to avoid all climbing of ladders, ropes, or scaffolds, but occasional postural activities otherwise [sic].  She is limited to unskilled work and could manage routine workplace changes, and sustain concentration, persistence, and pace for up to two-hour periods during the workday with short 5-10 minute breaks every two hours.  She would have no problems relating with coworkers and supervisors but should avoid excessive contact with the public.

(AR 13.)  Given this RFC, the ALJ found that Charbonneau was unable to perform her past relevant work as a kitchen worker or pharmacy assistant.  (AR 17.)  Finally, based on testimony from the VE, the ALJ determined that Charbonneau could perform other jobs existing in significant numbers in the national economy, including courier, storage facility rental clerk, and office helper.  (AR 18.)  The ALJ concluded that Charbonneau had not been under a disability from the alleged onset date of December 13, 2007 through the date of the decision.  (AR 19.)

The DRB affirmed the ALJ's decision, but supplemented it on two points.  First, noting that the record suggested Charbonneau had obesity, the DRB evaluated the condition pursuant to SSR 02-1p, ultimately determining that the ALJ's RFC assessment accommodated any reasonable restrictions associated with obesity.  (AR 1.)  Second, addressing a September 2010 letter from Charbonneau's representative's which presented arguments against the ALJ's decision, the DRB found that none of those arguments warranted disturbing the ALJ's decision.  (*Id.*)  Specifically, the DRB discussed the ALJ's findings regarding an October 2009 Interdisciplinary Evaluation (described in

detail below), considered the Evaluation "in light of the totality of the evidence," and concluded that the ALJ's evaluation and weighing of the Evaluation was proper.  (AR 2.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

**I.     The ALJ's Assessment of the Interdisciplinary Evaluation Was Proper.**

In October 2009, Charbonneau underwent an Interdisciplinary Evaluation ("IDE"), which consisted of a physical therapy evaluation performed by Physical Therapist ("PT") Traci Glanz, an occupational therapy evaluation performed by Occupational Therapist ("OT") Linda Sheridan, and a psychological evaluation performed by psychologist Dr. JoAnn Joy.  (AR 503-16; *see also* AR 482-86.)  PT Glanz found that Charbonneau would be a candidate for a functional interdisciplinary rehabilitation program and would benefit from pain management strategies.  (AR 504.)  OT Sheridan found that Charbonneau was an excellent candidate for occupational therapy in order to improve her ability to manage pain, improve functioning, and return to work.  (AR 505.)  Sheridan further opined that Charbonneau's functioning was at the sedentary level, but she had a "good prognosis to go from sedentary to light" work.  (AR 506.)  Dr. Joy opined that, although Charbonneau was highly fearful of pain and had little knowledge of effective pain management strategies, it was unlikely that mental health issues would complicate her ability to participate effectively and benefit from an interdisciplinary treatment program.  (AR 508-09.)  In summary, the IDE providers stated that Charbonneau tested in a sedentary work

capacity, although there was no indication that she could sustain that level for a full work day.  (AR 514.)  They opined that Charbonneau "expressed a fair to poor knowledge of active pain management strategies," relying instead on activity-avoidance and narcotic medications; and that Charbonneau's limitations appeared to result in "significant occupational impairments, as evidenced by decreased ability to perform work tasks, decreased ability to participate in previously enjoyed recreational activities, and difficulty with performing household tasks."  (AR 515.)  Finally, the interdisciplinary team recommended that Charbonneau participate in a "Level 4 Functional Restoration Program," which they stated was designed "for individuals with severe functional limitations and severe psychosocial barriers to recovery."  (*Id.*)

The ALJ gave only "some weight" to the opinions of Glanz, Sheridan, and Dr. Joy, implicitly rejecting the finding that Charbonneau could perform only sedentary work, and stating: "The opinion that [Charbonneau's] observed abilities indicated that she suffered from significant occupational impairments preventing her from sustaining work . . . is contradicted by [Charbonneau's] observed abilities and opinions from other providers."  (AR 17.)  Nonetheless, the ALJ explicitly affirmed Sheridan's opinion (contained in the IDE) that Charbonneau had the ability to progress to the point where she could sustain light work, stating that such opinion was "consistent with [Charbonneau's] demonstrated abilities and functional limitations throughout the evidence of record."  (*Id.*)  Charbonneau contends that the ALJ erred in his evaluation of the IDE, and more specifically, in the weight afforded to the opinions contained therein.

Contrary to Charbonneau's assertion (*see* Doc. 17-1 at 5-6), the ALJ was not required to analyze the IDE under the treating physician rule because none of the opinions contained therein were made by "treating physicians."  Specifically, Sheridan and Glanz were therapists, not physicians or psychologists.  *See* SSR 06-03p, 2006 WL 2329939, at *1-2 (Aug. 9, 2006) (noting that only the opinions of "acceptable medical sources" – including physicians, psychologists, optometrists, podiatrists, and speech-language pathologists – may be entitled to controlling weight under 20 C.F.R. § 404.1527(d)).  Moreover, Dr. Joy does not appear to have had a treating relationship with Charbonneau, as she evaluated Charbonneau on only one occasion.  *See Garcia v. Barnhart*, No. 01 Civ. 8300, 2003 WL 68040, at *5, n.4 (S.D.N.Y. Jan. 7, 2003) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Jones v. Apfel*, 66 F. Supp. 2d 518, 525 (S.D.N.Y. 1999)) (noting that physicians who see patients only once do not have a chance to develop an ongoing relationship and thus are generally not considered treating physicians).  Nonetheless, the opinions contained in the IDE were entitled to some consideration, and the ALJ was required to analyze them using the familiar factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6), including the length, frequency, nature, and extent of the treatment relationship; the degree to which the source presented relevant evidence to support his or her opinion; whether the source specialized in the medical area upon which he or she opined; and whether the opinion is consistent with the record as a whole.

Although the ALJ did not explicitly apply each of these factors in his analysis of the IDE, he did note the specialties of the providers and the nature and extent of their

treating relationship with Charbonneau.  (AR 17 ("The opinion of Linda Sheridan, OTR-L, Traci Glanz, PT, and JoAnn Joy, Ph.D., is given some weight.  These parties performed an occupational therapy intake evaluation of [Charbonneau] in October 2009.").)  More importantly, the ALJ considered whether the opinions contained in the IDE were consistent with the record as a whole, and found that they were not.  (*Id.*)  Specifically, the ALJ determined that: (a) the IDE opinion that Charbonneau suffered from significant occupational impairments preventing her from sustaining work was contradicted by "[Charbonneau's] observed abilities and opinions from other providers"; and (b) the IDE opinion that Charbonneau had the ability to progress to the point where she could sustain light work was consistent with "[Charbonneau's] demonstrated abilities and functional limitations throughout the evidence of record."  (*Id.*)  The Court finds that substantial evidence – much of which the ALJ considered throughout his decision – supports these findings.

For example, with respect to Charbonneau's back pain, an MRI of the lumbar spine revealed "normal" results (AR 219); a CT of the lumbar spine revealed "[n]o evidence of acute displaced . . . fracture" (AR 274); an MRI of the cervical spine revealed only facet joint arthropathy and cervical spondylosis, but was "[n]egative" for acute displaced fracture or subluxation (AR 220); and a CT of the thoracic spine revealed "[n]o evidence of acute displaced . . . fracture" (AR 273).  Medical sources confirmed that these test results were negative or unremarkable.  (AR 263, 282, 331, 483, 491, 503).  Additionally, treatment notes from Dr. S. Hannah Rabin and Dr. Joseph Haddock indicate that, although Charbonneau initially complained of back pain after her December 2007

10

motor vehicle accident (AR 263), by April 2008, her pain was improving (AR 258).  The record demonstrates that her pain continued to improve with treatment through July 2008. (AR 239-44, 251, 253.)  In August 2008, although Charbonneau reported increased pain, it was noted that such increase was due to her having been "on [her] feet more taking care of [her] husband."  (AR 238.)  In October 2008, Charbonneau reported having "significant [back] spasms" (AR 250), but, as noted by the ALJ (AR 15), approximately six months later, she reported that overall she was "doing well" and her back pain bothered her only "once in a while" (AR 410).

In June 2009, Charbonneau fell at WalMart, triggering new complaints of back pain; but with the exception of positive straight leg-raising, examination revealed normal results.  (AR 529.)  In August 2009, after examining Charbonneau, Physician Assistant Robert Hemond noted that "[the medical record] and physical examination [we]re not concordant with [Charbonneau's] symptoms and subjective complaints."  (AR 511.) Hemond further noted that Charbonneau exhibited "5/5 Waddell signs[2] on physical examination reflecting a psychological overlay."  (*Id.*)  By September 2009, Dr. Haddock stated that Charbonneau's back was "not great but fair"; Charbonneau reported to the Doctor that she was "moving [better] than she ha[d] in quite a while"; and Charbonneau was encouraged to continue her "range of motion exercises."  (AR 525.)  About a month

---

[2] There are eight clinical findings, otherwise known as "Waddell signs," which an examiner evaluates when assessing a patient complaining of back pain. *See* 2 DAN J. TENNENHOUSE, ATTORNEYS MEDICAL DESKBOOK § 18:4 (4th ed. 2010).  "Each sign is caused by non-anatomical (functional) factors and implies that the back pain has no physical cause.  One or two of these signs may arise from patient anxiety or eagerness to cooperate.  *Three or more are usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality.*"  *Id.* (emphasis added).

later, in October 2009, Charbonneau reported to therapist Glanz that her pain increased as the day progressed if she stood too long, or if she increased her activity.  (AR 483.)  But, as recognized by the ALJ (AR 15), she also reported that this pain was "relieved with sitting for a short period of time" (AR 483).  Further, Charbonneau told Glanz that she was "independent with all household activities," although she could not do heavy tasks like carrying a 50-pound bag of potatoes.  (*Id.*)  Considering this evidence, the ALJ stated: "Th[e] allegation of pain and relief is adequately considered [in the RFC determination] with the ability to alternate between sitting and standing at will."  (AR 15.)

The ALJ also considered the December 2009 evaluation of Dr. Philip Davignon. (AR 15-16, 488-93.)  Although Dr. Davignon's evaluation revealed that Charbonneau experienced discomfort, tenderness, and decreased range of motion of the lumbar spine; it also demonstrated that Charbonneau's cervical spine and upper extremities were normal with intact range of motion, strength, reflexes, and sensation; and that Charbonneau had full range of motion of the hips, knees, and ankles; intact motor strength; non-antalgic gait; and could perform a single knee bend on either side without difficulty.  (AR 492-93.)  Nowhere in the evaluation does Dr. Davignon opine that Charbonneau was more functionally limited than the ALJ determined she was.

In addition to the medical evidence, the ALJ properly considered that Charbonneau had "consistently performed a full range of activities of daily living and maintained social interactions," including playing bingo, socializing with friends, and completing household chores.  (AR 15; *see also* AR 12.)  Indeed, the record demonstrates

12

that, although she had pain and spent much of her day sitting, Charbonneau was able to perform all personal care tasks on her own; prepare meals, taking breaks as needed to rest her back; make the beds; do the laundry; mop; load the dishwasher; go shopping; and visit with family.  (AR 161-67.)  Although "a claimant need not be an invalid to be found disabled," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), the Second Circuit has held that it is proper for an ALJ to consider a claimant's daily activities in determining whether the claimant is disabled.  *See, e.g., Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009) ("in assessing the credibility of a claimant's statements, an ALJ must consider . . . the claimant's daily activities"); SSR 96-7p,1996 WL 374186, at *5-6 (July 2, 1996).

Charbonneau argues that the ALJ erred in affording more weight to the opinions of non-examining agency consultants Drs. Leslie Abramson and Joseph Patalano than to the opinions of examining providers Glanz, Sheridan, and Dr. Joy.  However, substantial evidence supports the ALJ's decision to give lesser weight to the opinions of the examining providers and "great weight" to those of the non-examining consultants.  (AR 15-16.)  Although, as Charbonneau points out, in many cases it is proper for the ALJ to give reduced weight to the opinions of non-examining agency consultants in comparison to the weight afforded to examining sources; the regulations clearly permit the opinions of non-examining agency consultants to override those of examining sources, when the former are more consistent with the record evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567-68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override

13

treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, as the ALJ stated in his decision, the opinions of consultants Drs. Abramson and Patalano are "supported by and consistent with the evidence of record," including Charbonneau's own self-reporting.  (AR 16.)

Specifically, Dr. Abramson opined in May 2009 that Charbonneau could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and push and/or pull without restriction.  (AR 470. )  A few months earlier, in February 2009, Dr. Patalano opined that Charbonneau had mild restriction in daily activities; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (AR 399.)  Dr. Patalano further opined that Charbonneau retained understanding and memory for 3-plus step tasks; may have some occasional problems with concentration, persistence, and pace, but could sustain concentration, persistence, and pace for 2-hour periods over an 8-hour workday; could collaborate with supervisors and co-workers; and could set goals, recognize hazards, travel, and manage routine changes.  (AR 405.)  The Court finds that substantial evidence, discussed above, supports these opinions.

Quoting *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011), Charbonneau argues that the opinion of Dr. Abramson should have been given "little weight" because the doctor did not review "the complete medical record."  (Doc. 17-1 at 9.)  But this case is

distinguishable from *Tarsia* because there, the record included an additional diagnosis and recommendation for surgery. *See Tarsia*, 418 F. App'x at 18. Here, there is no evidence of a new diagnosis or a worsening of Charbonneau's condition. In fact, although both Dr. Abramson and Dr. Patalano prepared their respective reports prior to completion of the record, the ALJ accurately found that their opinions remained consistent with the evidence, and that "later-received evidence did not demonstrate any change in [Charbonneau's] status and did not provide further support for the alleged severity of [Charbonneau's] limitations." (AR 16; *see, e.g.,* AR 488-93, 510-11, 522, 525.) Because the agency consultants' opinions are supported by the record, and the opinion contained in the IDE that Charbonneau could perform only sedentary work is not supported by the record, the ALJ did not err in affording more weight to the agency consultants' opinions than to those of the IDE providers.

Also noteworthy, the ALJ did not rely solely on the consultants' opinions in formulating his RFC assessment. Rather, it is apparent from his decision that the ALJ considered all the relevant evidence, including Charbonneau's own self-reporting to the Commissioner and to her treating and examining providers. The ALJ's consideration of the record as a whole in determining Charbonneau's RFC complied with the regulations, which provide that the ALJ must assess the claimant's RFC "based on *all* the relevant evidence in [the] case record," not based on the medical evidence alone. 20 C.F.R. § 404.1545(a)(1) (emphasis added).

Furthermore, the DRB provided additional explanation which supports the ALJ's decision to afford limited weight to the opinions contained in the IDE. Specifically, the

DRB accurately stated that the opinion contained in the IDE that Charbonneau was capable of only sedentary work was based on Charbonneau's performance during the evaluation, which "involve[d] great subjectivity." (AR 2.) As argued by the Commissioner, although the IDE included objective tests, such as range of motion and straight leg raising, the results of these tests were largely subjective, given that they were dependent on Charbonneau's reports of pain. (*See, e.g.,* 503-05.) The DRB also accurately stated that Charbonneau's reports of pain may have been exaggerated, considering that her IDE providers believed she was "pain[-]focused" and "had a fear of doing things because of an increase in pain." (AR 505; *see also* AR 509 ("her fear of pain is likely to complicate her ability to increase her level of activity").) Likewise, as noted above, Physician Assistant Hemond found that Charbonneau exhibited "5/5 Waddell signs on physical examination reflecting a psychological overlay." (AR 511.) In a neuropsychological evaluation, psychologists Drs. Gail Isenberg and Janis Peyser similarly found, stating that "[s]ymptom validity testing indicate[d] that non-neurologic factors interfered with [Charbonneau's] test performance and effort was insufficient to produce reliable results." (AR 540.) Drs. Isenberg and Peyser concluded that it appeared "likely that non-neurologic factors help[ed] drive [Charbonneau's] clinical complaints." (AR 541.) Also in accord, Dr. Waqar Waheed noted the lack of objective findings to support Charbonneau's subjective complaints of memory loss, and opined that her complaints could derive from a prior hemorrhage or an underlying mood disorder, or "there could be some secondary gain as she [was] trying to get disability." (AR 535.)

Finally, the DRB correctly supported the ALJ's decision to afford limited weight to the IDE, by pointing out that, despite the IDE providers' opinion that Charbonneau was an "excellent candidate" for a Level 4 Functional Restoration Program and recommendation that Charbonneau participate in such a program (AR 485, 515), Charbonneau opted against participating because "she did not feel that she would be able" (AR 490).[3]  (AR 2.)  It was proper for the DRB to consider this fact, as the regulations provide that if a claimant fails to follow prescribed treatment without a good reason, the Commissioner will not find the claimant disabled.  20 C.F.R. § 404.1530(b); *see also* 20 C.F.R. § 404.1529(c) ("treatments or other methods" used to alleviate a claimant's pain are "an important indicator of the intensity and persistence" of the claimant's pain).  Charbonneau's failure to participate in the Functional Restoration Program on the sole grounds that she did not feel as though she could, when considered in light of the record as a whole, supports affording only minimal weight to the restrictive limitations set forth in the IDE.  *See Russell v. Barnhart*, 111 F. App'x 26 (1st Cir. 2004) ("A claimant's failure to follow prescribed medical treatment contradicts subjective complaints of disabling conditions and supports an ALJ's decision to deny benefits.") (citing *Tsarelka v. Sec'y of Health & Human Servs.*, 842 F.2d 529, 534 (1st Cir. 1988) (per curiam) (affirming denial of benefits where claimant did not follow through with securing medical treatment); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (affirming denial of benefits where claimant failed to heed doctor's diet recommendation

---

[3]  In her Reply, Charbonneau suggests – for the first time – that she may not have participated in the Functional Restoration Program because she "could not financially afford to participate in i[t]."  (Doc. 25 at 10.)  There is no evidence in the record to support this suggestion; thus the Court rejects it.

which would have helped hypertension and headaches).

Contending that the DRB was not created for the mere purpose of "clean[ing] up" ALJs' flawed decisions, Charbonneau asserts that this Court may not consider the DRB's findings in contemplating whether substantial evidence supports the ALJ's decision. (Doc. 25 at 6.)  The law does not support this contention.  In fact, the case cited by Charbonneau in support of this assertion holds the very opposite:

> [T]he layers of administrative review are obviously in place to permit the Commissioner to identify and correct mistakes when they are found, including by amended decision.  20 C.F.R. §§ 404.967, 404.979, 416.1467, 416.1479.  If the Appeals Council concludes that further administrative proceedings need to occur before the ALJ, or if it desires further consideration and a recommended decision from the ALJ, it has the authority to order such proceedings.  Id. §§ 404.977, 416.1477.  On the other hand, if the Appeals Council concludes that it should decide the issues, it may do so and its decision can be reviewed by the Court in due course.  Id. § 404.979, 416.979.

Thibodeau v. Soc. Sec. Admin. Comm'r., No. 1:10-cv-00371-JAW, 2011 WL 4344561, at *2 (D. Me. Sept. 13, 2011) (emphases added).  The regulations clearly allow the DRB (or Appeals Council) to affirm the ALJ's decision, with supplementation, as was done in this case.  See 20 C.F.R. § 404.967 ("The Appeals Council may . . . grant the request [for review] and either issue a decision or remand the case to an administrative law judge.") (emphasis added); 20 C.F.R. § 404.979 ("The Appeals Council may affirm, modify or reverse the administrative law judge hearing decision . . . .") (emphasis added).

For these reasons, the ALJ properly considered the IDE, and substantial evidence supports the ALJ's findings regarding the opinions contained therein.

**II.    Substantial Evidence Supports the ALJ's Determination that Charbonneau Could Do Light Work.**

Next, Charbonneau asserts that the ALJ erred "by basing his finding that Ms. Charbonneau was capable of 'light' work activity on the prognosis that she could perform this work in the future," rather than on her ability to work at the time of the ALJ's decision.  (Doc. 17-1 at 11.)  As discussed above, the ALJ did not base his RFC determination on one single factor.  Rather, he correctly considered the record as a whole in determining Charbonneau's RFC, and substantial evidence supports that determination.

Furthermore, in determining Charbonneau's RFC, it was proper for the ALJ to consider Sheridan's statement in the IDE that Charbonneau had the ability to progress to the point where she could sustain light work.  (AR 17, 506.)  *See* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").  In fact, the medical record demonstrates that, when Charbonneau was actively engaged in prescribed treatment, her back pain was more manageable.  (*See, e.g.,* AR 251 (while continuing to do exercises and after recently having "an injection of some sort," her "back [wa]s a little better" and she was "getting by fairly well without analgesics"), 253 (continuing exercises, "[b]ack is a lot better and she is moving better"), 258 ("doing much better," "continuing with physical therapy twice a week," taking tramadol, and "using a TENS unit which is quite helpful"), 410 (taking Vicodin once or twice a week, back pain bothers her only "once in a while").)  But the record demonstrates that, when the IDE was performed, Charbonneau was no

longer doing her exercises, engaging in physical therapy, or effectively using pain-management techniques.  (*See, e.g.,* AR 503, 509.)  Therefore, it would have been proper for the ALJ to have found that, although at the time of the IDE, Charbonneau may not have been able to perform more than sedentary work, such a significant limitation was the result of Charbonneau's failure to follow prescribed treatment; and if she had followed such treatment, she may have been able to do light work.  In any event, the ALJ did not afford more than "some weight" to Sheridan's opinion regarding Charbonneau's ability to perform light work (AR 17), and clearly found that the record *as a whole* demonstrated that Charbonneau was able to do light work during the alleged disability period (AR 12-17).  Thus, Charbonneau's assertion that the ALJ "bas[ed]" his RFC determination on Sheridan's opinion regarding Charbonneau's ability to perform light work in the future (Doc. 17-1 at 11), is factually flawed and does not constitute grounds for remand.

## III.    Substantial Evidence Supports the ALJ's Sitting and Standing Restriction.

Finally, Charbonneau contends that the ALJ's RFC determination that she could perform a job if it allowed her to alternate between sitting and standing is not supported by the record, and more specifically, that no medical provider opined that Charbonneau had the ability to sit and stand alternately throughout an 8-hour workday.  (Doc. 17-1 at 12-13.)  Although it is true that no medical provider made this opinion, as noted above, the regulations provide that the ALJ must assesses the claimant's RFC "based on all the relevant evidence in [the] case record," not based solely on the medical evidence.  20 C.F.R. § 404.1545(a)(1).  The ALJ's determination that Charbonneau could perform light

work if allowed to alternate between sitting and standing is supported by the record, including Charbonneau's own self-reporting in social security forms and at the administrative hearing.  (*See, e.g.,* AR 131, 164, 167, 483, 514, 562-63.)  For example, as noted in the ALJ's decision, Charbonneau reported to a medical provider that her back pain worsened with increased activity or standing too long, but "was relieved with sitting for a short period of time."  (AR 15 (citing AR 483).)  And at the administrative hearing, Charbonneau testified that she was able to sit for 20-30 minutes at a time and stand on a cement floor for 10 minutes at a time.  (AR 563.)  Accordingly, substantial evidence supports the ALJ's sitting and standing restriction, and the ALJ did not commit legal error by including this restriction in his RFC determination.

### Conclusion

As discussed above, ALJ Martin conducted a thorough analysis of Charbonneau's claim, including consideration of the relevant medical opinion evidence.  The ALJ cited substantial evidence to support his findings, including his decision to afford only "some weight" to the Interdisciplinary Evaluation prepared by PT Glanz, OT Sheridan, and Dr. Joy.  This decision was properly supplemented by the DRB in its subsequent decision. For these reasons, the Court DENIES Charbonneau's motion (Doc. 17); GRANTS the Commissioner's motion (Doc. 22); and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 31st day of January, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

21